**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| AMADEO SANCHEZ, | 3:11-cv-00310-LRH (WGC) |
| Plaintiff, | **REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| vs. | |
| NEVADA DEPARTMENT OF CORRECTIONS, *et. al.* | |
| Defendants. | |

This Report and Recommendation is made to the Honorable Larry R. Hicks, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4.

Before the court is Defendant's Motion to Dismiss, or Alternatively, Motion for Summary Judgment. (Doc. # 16.)[1] Plaintiff opposed (Doc. # 20) and Defendant replied (Doc. # 23). The court construed Defendant's motion as one for summary judgment, gave Plaintiff an opportunity to conduct discovery and supplement his opposition, and allowed Defendant to file a supplemental reply. (*See* Doc. # 24, Doc. # 29, affirmed at Doc. # 41, *see also* Doc. # 43.)

Plaintiff filed another opposition (Doc. # 40) to which Defendant filed a reply (Doc. # 44). Plaintiff then filed a "Reply to Defendants [sic] Reply to Opposition to Summary Judgment" (Doc. # 45), which the court construed as Plaintiff's supplemental opposition. (*See* Doc. # 49.)[2] Plaintiff also subsequently filed a document he characterizes as his supplemental

---

[1] Refers to court's docket number.

[2] Plaintiff's comments at page 4 of his supplemental reply were stricken. (*See* Doc. # 49.)

opposition. (Doc. # 51, Doc. # 51-1.) Defendant filed a response addressing both of Plaintiff's supplemental briefs. (Doc. # 55.)

After a thorough review, the court recommends Defendant's motion be granted.

## I. BACKGROUND

At all relevant times, Plaintiff Amadeo Sanchez (Plaintiff) was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Compl. (Doc. # 6) at 1.) The events giving rise to this litigation took place while Plaintiff was housed at Ely State Prison (ESP). (*Id.*) Plaintiff, a *pro se* litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id.*) Defendant is Renee Baker (Defendant), ESP's warden and former associate warden of programs. (*Id.*, Screening Order (Doc. # 5) at 3-4.)

Plaintiff originally filed his Complaint in the Seventh Judicial District Court of the State of Nevada, in and for the County of White Pine, and Defendant subsequently removed the action to federal court. (*See* Doc. # 1.)

Plaintiff alleges that Defendant wrongly listed him as a member of various security threat groups (STG). (Doc. # 6 at 1.) Plaintiff further asserts that he has been listed as a member of "opposite gangs," and was housed with gang members, requiring him to defend himself from violence by hostile gang member inmates. (*Id.*) On screening, the court determined that Plaintiff states a colorable claim for deliberate indifference to his safety under the Eighth Amendment. (Doc. # 5 at 4.)

Defendant moves for summary judgment on the following grounds: (1) Plaintiff has improperly attributed conduct to Defendant which she did not participate in, and there was no genuine risk or threat to Plaintiff's safety based on his STG classification; (2) Defendant is entitled to qualified immunity; and (3) Plaintiff's request for injunctive relief is moot. (Doc. # 16.)

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

2

18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the

1  claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence
2  to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the
3  nonmoving party failed to make a showing sufficient to establish an element essential to that
4  party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at
5  323-25. If the moving party fails to meet its initial burden, summary judgment must be denied
6  and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress &*
7  *Co.*, 398 U.S. 144, 160 (1970).

8      If the moving party satisfies its initial burden, the burden shifts to the opposing party
9  to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*
10 *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,
11 the opposing party need not establish a material issue of fact conclusively in its favor. It is
12 sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the
13 parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*
14 *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The
15 nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations
16 that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions
17 and allegations of the pleadings and set forth specific facts by producing competent evidence
18 that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

19     At summary judgment, a court's function is not to weigh the evidence and determine the
20 truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.
21 While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be
22 drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not
23 significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations
24 omitted).

### III. DISCUSSION

**A. Eighth Amendment standard**

27     Under the Eighth Amendment, prison conditions should not "involve the wanton and

4

unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 932 (1994)(quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

An Eighth Amendment violation exists if a prisoner establishes that prison officials were "deliberately indifferent" to serious risks or threats to the inmate's safety. *Farmer*, 511 U.S. at 834. "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' [ ] having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833 (internal citation omitted, alterations original).

Under the deliberate indifference standard, a violation of the Eighth Amendment is only found when an objective and subjective component are met. *Farmer*, 511 U.S. at 834. First, "the deprivation alleged must be, objectively, sufficiently serious [ ]; a prison official's act or omission must result in the denial of 'the minimal civilized measures of life's necessities[.]'" *Id.* (internal citations omitted). When a plaintiff claims prison official's failed to take reasonable steps to protect him, the plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citations omitted).

Second, the inmate must satisfy the subjective element. This means that the prison official "must have a 'sufficiently culpable state of mind'", *Farmer*, 511 U.S. at 834, and must "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "Mere negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). Prison officials may avoid liability by: (1) proving they were unaware of the risk, or (2) proving they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844-

45.

A plaintiff "seeking 'a remedy for unsafe conditions' need not "'await a tragic event [such as an] actua[l] assaul[t] before obtaining relief." *Farmer*, 511 U.S. at 846 (citations omitted, alterations original).

Therefore, in order to meet her burden on summary judgment, Defendant must provide evidence establishing: (1) that the deprivation suffered by Plaintiff is not sufficiently serious; or (2) that she did not know of and act with deliberate indifference toward Plaintiff's risk of harm. *Farmer*, 511 U.S. at 834-35. To avoid summary judgment, Plaintiff must show that the alleged deprivation was sufficiently serious -that he faced a substantial risk of serious harm-and that Defendant's conduct constituted deliberate indifference. *Id.* To prove knowledge of the risk, the inmate may rely on circumstantial evidence. The very obviousness of the risk may be sufficient to establish knowledge. *See Farmer*, 511 U.S. at 842; *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).

To grant injunctive relief concerning serious risks to an inmate's safety, the court must find that at the time the relief will be granted, there is still a serious, present risk to the inmate and prison officials are still acting with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 845-47; *see also Helling v. McKinney*, 509 U.S. 25, 35-36 (1993).

**B. Relevant facts**

Pursuant to NDOC Administrative Regulation (AR) 446, a Security Threat Group (STG) is:

> A group of three (3) or more individuals united by a common bond and activity, characterized by criminal or disruptive conduct, which is committed either collectively or individually, and which has the potential to create a threat to security, peace and safety of Department facilities, staff, inmates or the general public. This includes, but is not limited to, gangs.

(Doc. # 16-1 at 7 (version of AR 446 effective August 22, 2005 through August 14, 2009); *see* similar language in version effective August 14, 2009 at Doc. # 16-1 at 14.) While the Office of the Inspector General has "primary responsibility for the identification and management of STGs," "[a]ll Department staff will share the responsibility in identifying STGs[.]" (*Id.* at 6.)

6

**1. First term of imprisonment**

In 2000, Plaintiff was listed as stating that he was a former 18th Street gang member in New Mexico. (Doc. # 16-1 at 21.) A memorandum dated May 20, 2000, states that Plaintiff has been identified as being affiliated or associated with an STG group, including the 18th Street gang from Albuquerque, New Mexico, and the Sureno gang. (*Id.* at 22.) Plaintiff affirmed his affiliation with the 18th Street gang of New Mexico on several occasions in 2001. (*See* Offender Information Summary at Doc. # 16-1 at 26, entries dated April 16, 2001, May 4, 2001, May 7, 2001, and May 16, 2001.)

The Offender Information Summary entry for September 20, 2001, states that Plaintiff was a "shot caller" when he ordered two other Sureno gang members to assault another inmate, resulting in serious injuries. (Doc. # 16-1 at 26; *see also* investigation report at Doc. # 16-1 at 39.)

At a May 17, 2002 classification review, Plaintiff reported problems with Surenos due to not being from Nevada. (Doc. # 16-1 at 27.)

On April 22, 2003, Plaintiff was placed in administrative segregation after being assaulted in the gym. (Doc. # 16-1 at 28.) Plaintiff reported that he was from New Mexico and did not want to get involved with the Surenos. (*Id.*)  It was noted he would not be placed on the yard with other active Surenos. (*Id.*)  This was reiterated in the case notes for May 8 and 20 and June 30, 2003. (*Id.* at 29.)

On July 10, 2003, during an exit strip search, a note was found in the insole of Plaintiff's shoe that appeared to be from another inmate telling Plaintiff to take out the enemy situation at Nevada State Prison (NSP) so that the inmate could go there.  (Doc. # 16-1 at 29.) Plaintiff proffered the explanation that this was a note from his friend telling him to take care of his enemy listings as it could prevent transfers to other yards. (Doc. # 16-1 at 29, July 15, 2003 entry.)

These circumstances were reiterated in the notes from August 4, 2003. (Doc. # 16-1 at 30.) In addition, it was stated, "[appears] this inmate has the possibility from being hurt again"

1 and "[a]ppears getting assaulted/bothered by not ganging up." (*Id.*) Plaintiff was scheduled to
2 be transferred from administrative segregation at NSP to close protective segregation at ESP
3 on August 12, 2003. (*Id.*, *see also* August 11, 2003 entry.)

4 After transferring to ESP on August 12, 2003, Plaintiff claimed to have problems with
5 Surenos, but found an agreeable cell mate at ESP. (Doc. # 16-1 at 30, August 14, 2003 entry.)

6 On April 2, 2004, Plaintiff requested a classification review because he and his cell mate
7 could no longer live together; however, Plaintiff denied that he felt threatened or that he was
8 in fear for his life. (Doc. # 16-1 at 31, April 2, 2004 entry.) At that time, Plaintiff did not have
9 an STG validation, but claimed association with the 18th Street gang of New Mexico. (*Id.*) He
10 admitted his affiliation with the 18th Street gang again on September 7, 2004, and prior to
11 being released on parole on January 25, 2005. (*Id.*, September 7, 2004 and January 25, 2005
12 entries.)

13 Plaintiff was granted parole, and was transferred to Southern Desert Correctional Center
14 on January 26, 2005, for release. (Doc. # 16-1 at 31, September 9, 2004 and January 26, 2005
15 entries.) At that time, Plaintiff noted that he had problems with Surenos, and claimed an
16 affiliation with a New Mexico gang. (*Id.*) He was housed in lock down pending his release. (*Id.*)

17 **2. Second term of imprisonment**

18 After being paroled, Plaintiff was arrested for a parole violation and taken back into
19 custody on October 17, 2005. (Doc. # 16-1 at 31, July 19, 2005 and October 17, 2005 entries.)
20 At that time, it was noted that Plaintiff may be an MRU[3] gang member. (*Id.*, October 17, 2005
21 entry.)

22 Plaintiff underwent an initial classification review on October 21, 2005. (Doc. # 16-1 at
23 32, October 21, 2005 entry.) Plaintiff indicated he had no NDOC enemies, but reported he was
24 affiliated with the 18th Street gang. (*Id.*) The Investigator General's office prepared an STG
25 identification report reflecting Plaintiff's affiliation with the MRU gang based on Plaintiff's

26

---

27 [3]MRU is an acronym for "Mi Raza Unida." (*See* Decl. of Pam Del Porto, Doc. # 16-2 at 2, ¶ 1.)

28                                              8

1 affiliation with New Mexico gangs, his request to live with MRU because he was associated with
2 them, and his cousin's affiliation with that gang. (*Id.*; *see also* Doc. # 16-1 at 53 (Security Threat
3 Group Identification); Decl. of Pam Del Porto at Doc. # 16-2 at 2, ¶ 3.) Plaintiff was therefore
4 validated as a member of MRU.[4] (*See* Decl. of Pam Del Porto at Doc. # 16-2 at 2, ¶ 1.)

5 On May 26, 2006, Plaintiff was reviewed for a transfer from High Desert State Prison
6 (HDSP) to Lovelock Correctional Center (LCC) as a result of a depopulation of the MRU
7 occurring at HDSP. (Doc. # 16-1 at 32, May 26, 2006 entry.) Plaintiff was approved for transfer,
8 and it was noted that the MRU from HDSP would have their own housing area in general
9 population at LCC, separate from other medium custody inmates. (*Id.*)

10 Plaintiff was received at LCC on June 1, 2006, and was housed in the separated general
11 population unit for MRU. (Doc. # 16-1 at 32, June 1, 2006 entry.) Plaintiff was advised that he
12 would have no contact with other LCC inmates for his own safety due to his MRU STG
13 validation. (*Id.*) Plaintiff stated that he was not MRU, he is from New Mexico, and did not have
14 any MRU or Sureno tattoos. (*Id.*) Plaintiff was instructed to talk to his unit caseworker
15 regarding his STG status. (*Id.*) It was noted that Plaintiff "was happy with the accommodations
16 and expressed no concerns other than his STG status." (*Id.*)

17 Plaintiff was reviewed and approved for a transfer to ESP on September 29, 2006, after
18 it was discovered that Plaintiff and another inmate had been writing to a general population
19 inmate at LCC, who had been giving the letters to another validated Sureno STG member.
20 (Doc. # 16-1 at 32, September 29, 2006 entry; *see also* Notice of Charges at Doc. # 16-1 at 40-
21 41.)

22 Upon intake at ESP, Plaintiff did not deny his MRU STG designation. (Doc. # 16-1 at 33,
23 October 5, 2006 entry.) He claimed to have no enemies at ESP. (*Id.*) Plaintiff agreed to cell with
24 inmate Ramos. (*Id.*)

25 On October 21, 2006, Plaintiff sent a request to his caseworker for a hearing regarding

26 ⸻

27 [4]"Validation" denotes that an inmate has been labeled based on an objective criteria.(*See* Decl. of Pam Del Porto, Doc. # 16-2 at 2, ¶ 2.)

28

1  STG status. (Doc. # 40 at 13.)

2  At a classification review on September 14, 2007, it was noted that the goal was to have
3  Plaintiff return to LCC's MRU unit. (Doc. # 16-1 at 33, September 14, 2007 entry.)

4  Plaintiff received another classification review on January 15, 2008, and requested a
5  transfer to LCC's MRU unit. (Doc. # 16-1 at 33, January 15, 2008 entry.)

6  On March 5, 2008, Plaintiff again requested transfer to a medium yard, but was advised
7  that due to his STG affiliation LCC was the only possibility, but Plaintiff currently had an
8  enemy there so the transfer could not be effectuated. (Doc. # 16-1 at 33, March 5, 2008 entry.)

9  Plaintiff renewed his request for a transfer to a medium security institution at a
10 classification review on April 1, 2009. (Doc. # 16-1 at 34, April 1, 2009 entry.) Plaintiff was
11 informed that he would be scheduled for a review to consider his request. (*Id.*)

12 On April 24, 2009, Inspector General Pam Del Porto sent an email to employees of the
13 Offender Management Division of NDOC inquiring whether Plaintiff might be safely housed
14 within NDOC. (Decl. of Pam Del Porto at Doc. # 16-2 at 2, ¶ 4, Attachment 1 at Doc. # 16-2 at
15 5.)

16 Defendant became the Associate Warden of Programs at ESP on June 29, 2009, and
17 remained in that position until she became acting warden in January 2011. (Doc. # 16 at 6,
18 ¶ 23.)

19 At a September 25, 2009 classification review, Plaintiff was informed he was not eligible
20 for a custody reduction due to his STG issues. (Doc. # 16-1 at 34.)

21 Plaintiff was charged with fighting with his cell mate on December 9, 2009. (Doc. # 16-1
22 at 42.) A disciplinary hearing was held on December 28, 2009. (*Id.* at 44.) Plaintiff entered a
23 plea of not guilty and provided a statement that he and his cell mate were "just playing" and
24 they had lived together for twenty-two months. (*Id.* at 47.) Plaintiff was found guilty and given
25 fifteen days disciplinary segregation and restitution. (*Id.* at 45.)

26 As of December 30, 2009, Plaintiff was being considered for placement back in LCC's
27 MRU unit, but did not qualify as a result of the disciplinary hearing related to the cell fight.

28

10

1  (*Id.*, December 30, 2009 entry.)

2  In a January 1, 2010 informal level grievance regarding being assessed restitution for
3  medical charges related to the December 9, 2009 fighting incident, Plaintiff stated, "my cellie
4  and I were play wrestling. A C/O thought we were fighting." (Doc. # 16-1 at 58.)

5  As of January 19, 2010, Plaintiff had completed disciplinary segregation related to the
6  fight with his cell mate. (Doc. # 16-1 at 34, January 19, 2010 entry.) Plaintiff's STG was still
7  listed as MRU. (*Id.*) Plaintiff stated that he was asked at intake if he would cell with an MRU
8  due to housing needs, and was labeled by staff as MRU after doing them a favor. (*Id.*) The
9  committee discussed with Plaintiff his living with MRUs and being in the MRU unit in LCC in
10 the past, and his recent requests to return to LCC's MRU unit, and Plaintiff said that he only
11 saw it as a way to leave ESP. (*Id.*)

12  In February of 2010, Plaintiff wrote a letter to Inspector General Pam Del Porto.
13 (*See* Decl. of Pam Del Porto at Doc. # 16-2 at 2, ¶ 5, Attachment II at Doc. # 16-2 at 7-10.) In
14 the letter, Plaintiff disclaimed his affiliation with the Sureno and MRU gangs. (Doc. # 16-2 at
15 7.) He explained that he was labeled as a Sureno when he came into the system, even though
16 he was not a Sureno. (*Id.*) He eventually got into an altercation with the Surenos and was sent
17 to ESP, where he had no problems until he was paroled. (*Id.*) When he returned to prison later
18 in 2005, he was housed with MRUs at HDSP. (*Id.*) He asserted that this was done as a favor
19 to a caseworker who needed to make room on the tier. (*Id.*) Since that time, he had been
20 housed with MRUs and labeled as MRU. (*Id.*) He was sent with the MRUs to LCC and housed
21 with them there until he got caught sending a letter to another inmate. (*Id.*) Plaintiff was sent
22 back to ESP and was housed with Carlos Perez. (*Id.* at 7-8.) Plaintiff states that things went
23 fine with his cell mate, but he made requests to transfer to avoid an altercation. (*Id.*) He claims
24 that eventually there was an altercation. (*Id.*) Plaintiff requested that the STG validation be
25 removed and that he be allowed to transfer. (*Id.* at 9.)

26  As of March 16, 2010, Plaintiff's STG status was being reviewed by Defendant and the
27 Inspector General's Office. (Doc. # 16-1 at 34, March 16, 2010 entry.) This review apparently

28                                             11

1 | continued in April and May of 2010. (*See* Doc. # 16-1 at 35, April 14, 2010 and May 10, 2010
2 | entries.)

3 |     Plaintiff was seen on July 15, 2010, for a full classification committee review and a
4 | possible transfer to Nevada State Prison's (NSP) MRU unit was discussed. (Doc. # 16-1 at 35,
5 | July 10, 2010 entry.) Plaintiff stated that he was not MRU. (*Id.*) No action was taken pending
6 | Defendant's notification regarding scheduling an STG hearing. (*Id.*)

7 |     Plaintiff was seen on July 22, 2010, for an administrative segregation review. (Doc. #
8 | 16-1 at 35, July 22, 2010 entry.) Plaintiff is noted as having denied his affiliation to Nevada
9 | gangs. (*Id.*) Plaintiff stated that he was labeled MRU at intake because he agreed to live with
10 | an MRU member. (*Id.*) Plaintiff requested transfer to another yard, and was advised that
11 | determination would have to wait because he was being reviewed for an STG hearing. (*Id.*)

12 |     Plaintiff appeared for his STG due process hearing on October 12, 2010. (Doc. # 16-1 at
13 | 35, October 12, 2010 entry; *see also* Notice of Due Process Hearing at Doc. # 16-1 at 55.) The
14 | committee determined that Plaintiff's STG affiliation would stand, but that Plaintiff would be
15 | identified as inactive. (*Id.* at 36; *see also* Doc. # 16-1 at 56.) Plaintiff was advised he could
16 | appeal the decision. (*Id.*) The committee members were Willis, Chambliss, and Oxborrow. (*Id.*)

17 |     On November 9, 2010, it was noted that the committee's decision was reviewed with
18 | Inspector General Del Porto and it was determined Plaintiff should be transferred to LCC for
19 | placement in the MRU unit. (Doc. # 16-1 at 36, November 9, 2010 entry.) It appears Plaintiff
20 | arrived at LCC on December 2, 2010, and argued with staff about STG issues. (*Id.*, December
21 | 2, 2010 entry.) He was placed in administrative segregation pending a determination from the
22 | Inspector General's Office and LCC's Warden LeGrand. (*Id.*, December 3, 2010 entry.)

23 |     A hypodermic needle kit and other contraband were found in Plaintiff's property upon
24 | arriving to LCC. (Doc. # 16-1 at 36, December 6, 2010 entry; *see also* Notice of Charges dated
25 | December 4, 2010 at Doc. # 16-1 at 50, indicating staff found tattoo related materials, needles,
26 | as well as gang related drawings.) One of the contraband items was a letter from Plaintiff's
27 | former cell mate Carlos Perez. (Decl. of Pam Del Porto at Doc. # 16-2 at 3, ¶ 8, Attachment III
28 |                                             12

at 17-27.) This is the same inmate that Plaintiff was sharing a cell with when he was charged with fighting on December 9, 2009. (*See* Doc. # 16-1 at 42.)

Plaintiff was de-validated as MRU by the Inspector General's Office on December 6, 2010, and a transfer back to ESP was approved for Plaintiff to serve a disciplinary sanction related to the contraband charges. (*Id.*; *see also* 37, January 26, 2011 entry; *see also* Decl. of Pam Del Porto at Doc. # 16-2 at 2- 3, ¶¶ 6-7.) The Inspector General's Office did not know about the disciplinary notice related the to contraband when Plaintiff was de-validated. (Decl. of Pam Del Porto at Doc. # 16-2 at 3, ¶ 8.)

**C. Analysis**

Plaintiff argues that he has been wrongly validated as STG as a result of his alleged affiliation with the Sureno and MRU gangs. (Doc. # 40 at 6.) He claims this has resulted in physical and emotional injuries. (*Id.*, Ex. H.) He asserts that Defendant received Plaintiff's grievances requesting removal of his STG classification and was part of the STG due process committee, but she made no effort to remove the classification. (*Id.* at 8.) Plaintiff concedes that his STG classification was ultimately removed. (*Id.*)

Preliminarily, Plaintiff includes multiple references to parole decisions, and it appears he is arguing he has been denied parole as a result of his STG classification. This is not an issue in the current action. This action relates solely to Plaintiff's allegation that Defendant was deliberately indifferent to a serious risk to his safety as a result of his STG validation and housing status.

After reviewing all of the evidence submitted by the parties, construed in favor of Plaintiff, the court finds there is no genuine issue of material fact as to Plaintiff's Eighth Amendment claim. Simply stated, there is no evidence that Plaintiff faced a substantial risk of serious harm, or that Defendant acted with deliberate indifference.

While the record contains notes of an isolated gang related assault in 2003, and problems with the Sureno gang in 2005 (*see, e.g.*, Doc. # 16-1 at 28-30, entries dated April 22, May 9, June 30, August 4, and August 14, 2003, and January 26, 2005), there is no evidence

that Defendant had knowledge of these incidents, or that they provided her with knowledge that Plaintiff faced a substantial risk of serious harm during her involvement with Plaintiff at ESP, when her tenure there did not begin until June 29, 2009.

The only incident Plaintiff points to that could have put Defendant on notice that Plaintiff faced a substantial risk of serious harm is the December 9, 2009 incident when Plaintiff was charged with fighting with his cell mate. (*See* Doc. # 40 at 2, 4, Doc. # 40 at 50-55 (Ex. H).)[5] According to the documentation surrounding this incident, there was a report of a fight between Plaintiff and his cell mate on December 9, 2009. (*Id.* at 51.) The inmates were taken from their cells, examined by medical, and refused treatment. (*Id.*) Plaintiff was charged with fighting, and entered a plea of not guilty. (*Id.* at 51-52.) A disciplinary hearing was held on December 28, 2009 before hearing officer Tony Jones. (*Id.* at 52.) Plaintiff was found guilty and received fifteen days in disciplinary segregation and was ordered to pay restitution. (*Id.* at 54.)

In a medical kite dated January 4, 2010, Plaintiff stated that he and his cell mate were "play wrestling" on December 9, 2009, although the correctional officer thought they were fighting. (Doc. # 45 at 22.) Plaintiff's gave a similar statement in connection with his disciplinary hearing, indicating that he and his cell mate were "just playing." (*Id.* at 27.) This statement was also repeated in an informal level grievance. (*See* Doc. # 45 at 63 ("On 12.9.09, my cellie and I were play wrestling. A C/O thought we were fighting...") Defendant's name appears on this informal level grievance as the grievance coordinator. (*Id.*)

Even taking into consideration the fact that Plaintiff was convicted of the fighting charge, there is nothing in the record to indicate any relationship between this cell fight and Plaintiff's STG status or gang affiliation. In fact, it is clear that Plaintiff and his former cell mate remained friendly after the incident. (*See* Doc. # 16-2 at 17-27.)

---

[5] Plaintiff also refers to an incident that occurred on September 18, 2001; however, there is no indication Defendant had any knowledge of this incident as it did not occur at ESP, and she did not begin her tenure at ESP until June of 2009. Moreover, the evidence presented by Plaintiff reflects that Plaintiff was involved in provoking the attack of another inmate, not that he was a victim. (*See* Doc. # 45 at 5, 38.)

Therefore, the evidence that would have been available to Defendant at the time establishes that the fight that occurred between Plaintiff and his cell mate did *not* pose a substantial risk of serious harm to Plaintiff. Plaintiff's attempts to characterize the fight otherwise at this time are unavailing. The Eighth Amendment inquiry requires that the court look at Defendant's subjective state of mind when the alleged unconstitutional conduct occurred.

In addition, the evidence reveals not that Plaintiff was concerned about a risk to his safety and security, but that he was concerned about his parole status and where he was housed. (*See i.e.,* Doc. # 40 at 18 ("I have my HS Diploma and G.E.D., I've [sic] completed every certificated [sic] program that exists in this system.  I am losing good time against me wanting to program.  I am labeled MRU but I am not MRU.  I came from the LCC unit they have…Now I would happily go back but the problem is space availability…I would really rather go to a camp…"); Doc. # 40 at 21 ("Have you looked into a camp or transfer…Now I would rather go to a camp but I would be happy to get out of this place."); Doc. # 40 at 15 ("I have all education and completed every certification program so I am losing good time against me wanting to program. Can you please put me in for a transfer to LCC."); Doc. # 40 at 77 ("I've [sic] completed every program that exists at Ely, I've finished all my education so I am being forced against my will of not programming and not earning good time even though I want to program.  In effect that is also effecting [sic] my sentence time structure and making my out date go further back…")Doc. # 40 at 82 ("Even if I get an STG hearing or transfer…it is not going to change the fact that I have lost good time the whole time I've been here…"); Doc. # 40 at 88 ("Im [sic] forced not to program, against my will of wanting to program.  Im [sic] also loseing [sic] good time for it which in effect is affecting my time and sentence structure like double jeopardy.").)

Having found no evidence that Plaintiff faced a substantial risk of serious harm, Defendant cannot be found to have acted with deliberate indifference.  As a result, the court recommends that summary judgment be granted in Defendant's favor.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **GRANTING** Defendant's Motion for Summary Judgment (Doc. # 16.)

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED: June 5, 2012.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE